RECEIVED
IN LAFAYETTE, LA.

FEB 2 6 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATE DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| ARKLA DISPOSAL SERVICES, INC. )<br>and JOHN E. TUMA )<br> )<br>versus )<br> )<br>THE CITY OF SHREVEPORT AND )<br>H. M. "MIKE" STRONG, in his official )<br>capacity as Director of the Department of )<br>Operational Services and in his personal )<br>capacity ) | **5:07-CV-0350**    **S'PORT**<br>**JUDGE HICKS**<br>**MAGISTRATE JUDGE HORNSBY**<br><br>MAGISTRATE: |

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Arkla Disposal Services, Inc. and John E. Tuma, who aver as follows:

### INTRODUCTION

1.

This is a suit for damages and other relief based on various causes of action arising under the U.S. Constitution and federal law, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and claims brought pursuant to 42 U.S.C.A. § 1983 for violations of the U.S. Constitution's prohibitions against denying Equal Protection and Due Process under the Fourteenth Amendment and guarantee of freedom from Malicious Prosecution.

737573.1

## PARTIES

2.

Arkla Disposal Services, Inc. (Arkla) and John E. Tuma (Mr. Tuma) seek damages, attorneys and expert fees, all costs, treble/punitive damages, and other equitable relief.

3.

Complainant, Arkla, is a corporation organized under the laws of the State of Arkansas, having a principal place of business in the State of Arkansas, a main office in the State of Texas, and who conducts business in the States of Arkansas, Louisiana, and Texas.

4.

Complainant, Mr. Tuma, is of lawful legal age and capacity and is domiciled in the State of Texas.

5.

Defendant, the City of Shreveport (City) is a municipality and a political subdivision of the State of Louisiana and is located within this Honorable Court's district.

6.

Defendant, H. M. "Mike" Strong (Mr. Strong), who resides and is domiciled in this Honorable Court's district, is of lawful legal age and capacity and is employed by the City of Shreveport as the Director of the Department of Operational Services. In that position, Mr. Strong is vested with the authority to "administer, implement, and enforce" the City of Shreveport's Code of Ordinances, in particular, those relating to discharges to

2                                                                                              737573.1

the City's sanitary sewer system. Code of Ordinances, Section 94-112. He is also charged with primary responsibility regarding all actions related to Industrial User Permits (IUPs).

## JURISDICTION AND VENUE

### 7.

This Court has jurisdiction of the subject matter of this action under 28 U.S.C.A. § 1331. The claims brought herein also exceed the value of $75,000 and are between citizens of different states. See 28 U.S.C.A. § 1332.

### 8.

Venue is proper in this district as the defendants are located, reside, domiciled and/or are employed in this district; a substantial part of the events giving rise to these claims also occurred in this Honorable Court's district. 28 U.S.C.A. § 1391(a) and (b); See also 18 U.S.C.A. § 1965(a).

## BACKGROUND FACTS

### Arkla and the Industrial User Permit

### 9.

Arkla operates a wastewater treatment facility that utilizes various processes to treat incoming wastewater so that oil and other pollutants are removed from the wastewater stream. The removed oil is further processed and sold as a valuable product.

10.

Arkla is fully authorized by the Louisiana Department of Environmental Quality and the Louisiana Department of Natural Resources to receive and treat industrial, hazardous, and oilfield exploration and production wastewaters.

11.

Arkla's business activities are not only conducted in interstate commerce, but its actions and products have a substantial effect on interstate commerce.

12.

In order to conduct its business activities, Arkla must discharge wastewater. Without the ability to make such discharges, Arkla's business activities would cease.

13.

Since March of 2003, Arkla has been fully authorized to make these needed discharges pursuant to an IUP granted to Arkla by the City. Mr. Strong was the Director of the City' Department of Operations Services at the time the IUP was granted.

14.

At all relevant times, the City was fully aware that oily wastewaters would be received and treated at Arkla's facility in Shreveport, Louisiana, which is the facility covered by the IUP. The City specifically amended the IUP to allow the receipt and discharge of such wastewater at this facility.

15.

At all relevant times, the City was fully aware that a certain amount of "petroleum oil" would be included in the wastewater discharged by Arkla to the POTW. This is evidenced by the fact that the City placed a numerical maximum limit for oil and grease (100 mg/L) in Arkla's IUP.

16.

At all relevant times, Arkla acted in compliance with the terms of its IUP.

17.

At all relevant times, the wastewater discharged by Arkla proceeds through the sanitary sewer gravity line to a lift station next door to Arkla (known as the Port Highway Lift Station) where it is pumped via a forced main line to the POTW. The sanitary sewer gravity line and the forced main line are operated solely by the City.

18.

At all relevant times, the City was aware that, prior to discharge into the sanitary sewer gravity line, some residual oil would separate from wastewater in Arkla's discharge tank(s) and float to the top of the tank(s). These tanks hold wastewater immediately prior to discharge into the sanitary sewer gravity line.

19.

At all times, the City was fully aware that the discharge pump(s) utilized by Arkla had a six-foot automatic shut-off, which assured that the top six feet of contents of the discharge tank (which might, at times, have included some valuable oil product that had

not yet been skimmed off) would not be discharged and would not constitute part of the discharge to the same sanitary sewer gravity line.

20.

At the time of the February spill, Arkla and the City had developed a common and cooperative practice and procedure under the IUP relating to discharges from the tank(s). This practice and procedure had been established with input and consent from the City, and in which:

a) Arkla sampled and analyzed the material which had collected in the discharge tank(s);

b) Arkla then submitted, via facsimile, the analytical information to the City for approval;

c) While waiting on a response from the City, Arkla continued to skim oil from the top of the discharge tank(s) so that the oil could be further processed and sold (Again, this is the oil that had separated from the water in the discharge tank(s) and floated to the top. It is a product with substantial value for which discharging makes no economic sense.);

d) City, after reviewing the analytical information submitted by Arkla to ensure compliance with the numeric limits in Arkla's IUP, would send Arkla a written approval to discharge the contens of the tank(s); and

e) Arkla, after receiving City's written approval, would discharge the remaining material to the sanitary sewer gravity line leading through the nearby lift station and into the POTW.

737573.1

21.

At all relevant times, the City was fully and completely aware that Arkla's process of routine skimming or removing oil from the top of the discharge tank(s) was similar to that used by other industrial users of the City's POTW and was standard industry practice.

22.

From 2003 to 2005, the City readily amended Arkla's IUP several times, at Arkla's request, to allow Arkla to discharge wastewaters resulting from the receipt and treatment of hazardous and oilfield exploration and production wastewaters.

23.

In 2005, a minor violation by Arkla was noted by Mr. Strong's office. During the resolution of this violation, personal differences arose between Mr. Tuma and Mr. Strong. After resolving this minor violation, Mr. Strong informed Mr. Tuma that if Mr. Strong had to take action against Arkla again, Mr. Strong would "pull" Arkla's IUP. On information and belief, minor violations at other facilities do not normally illicit this type of threat.

**The First Compliance Order**

24.

On February 14, 2006, and pursuant to approval provided by the City under the standard procedures described hereinabove, Arkla discharged wastewater to the POTW with a documented oil and grease content of 4.0 mg/L (well under its limit of 100 mg/L),

ending its discharge at approximately 6:30 a.m. This discharge was done with the City's consent, knowledge, and approval after the submission of analytical samples to City.

25.

On February 14, 2006, at approximately 7:00 a.m. when the Port Highway Lift Station (through which all of Arkla's wastewater must proceed) was inspected during a routine maintenance, "straight oil" was not discovered in the lift station's pump or sumps.

26

On or about the early afternoon of February 14, 2006, a spill or release of oil occurred or was discovered in a field approximately one and a half miles from the Arkla facility. Representatives of the Louisiana Department of Environmental Quality described the oil in the field as "straight oil."

27

There are multiple industrial users of the POTW who discharge into the sanitary sewer system from which the spill occurred and multiple oil and gas exploration and production operations and facilities in the area.

28

Despite the fact that oil was not found in the lift station (through which all of Arkla's wastewater must proceed) and despite the presence of numerous other potentially responsible parties, Mr. Strong, without investigating any other entity and without support, proof, or evidence, claimed that Arkla was responsible for the spill or release.

29.

No evidence was ever offered or provided to Arkla from the City and/or Mr. Strong that indicated Arkla caused the spill or release. On information and belief, as the sole operator of the sanitary sewer gravity line and the forced main line, the actual cause of the February spill is the City's failure to properly and prudently control, repair, maintain, inspect, and operate said lines and associated equipment.

30.

Pursuant to its IUP and following all established protocol, Arkla, on February 17, 2006, submitted analytical information to the City (which, as before, showed that the discharge was within all permitted limits) and requested approval to discharge.

31.

The City denied the request to discharge, stating that, although the discharge was "within limits," petroleum oil existed on top of the tanks to be discharged. Although the top of the discharge tank does not constitute part of the discharge, Arkla offered to remove, under City supervision, all petroleum oil from the top of the tank and institute other procedures to ensure that Arkla met and exceeded all of the parameters of its IUP. In contravention of Arkla's vested property right represented by the IUP, the City still refused to approve the discharge. There was no hearing or any manner of due process given to Arkla either before or after this deprivation of its property right in the IUP and discharge tanks.

9                                                                                    737573.1

32.

The City then issued a Compliance Order (CO) to Arkla on February 24, 2006 (the February CO), prohibiting discharges to the City's POTW until all "petroleum oil" was removed and unspecified improvements and/or procedures implemented to ensure that "petroleum oil" was not discharged into the City's system. City represented to Arkla that it would again allow discharges if these changes were made by Arkla.

33.

Although Arkla disputed that it caused "petroleum oil" to be so handled or discharged, Arkla instituted all of the City's requested procedures and installed a filter system, at substantial costs to Arkla, though which all of Arkla's wastewater would be routed for additional treatment prior to discharge into the City's POTW. There was no hearing or any manner of due process given to Arkla either before or after this further deprivation of its property rights, which rights were taken when Arkla was forced to expend substantial costs under the promise that its property rights in the IUP of the discharge tank would be restored.

34.

In spite of the continued validity of Arkla's IUP, the City's representations that it would allow Arkla to continue discharging once the filtration system was in place, and Arkla's complete compliance with all of City's demands, City again denied Arkla the right to discharge on February 27, 2006. Once more, there was no hearing or any manner of due process given to Arkla before or after this denial related to it being denied the use of its property, i.e. its IUP and the discharge tank.

35.

On information and belief, Mr. Strong, by virtue of his office and under color of that office and state law, either directly made the decision to deny Arkla the right to discharge or influenced the person who purported to make the decision.

36.

As a direct result of the denial of the right to discharge under the terms of the IUP, Arkla had no additional tank capacity to store or treat incoming wastewater. It had to turn away incoming deliveries and was forced to cease operating, which resulted in damages, including without limitation, a loss of income, reputation, good will, and standing in business community.

37.

City and Mr. Strong continued to arbitrarily, capriciously, and without legal or factual support and/or cause, denied Arkla the right to discharge under the terms of its IUP, even though the wastewaters to be discharged were "within limits."

38.

At all relevant times, City and Mr. Strong were well aware of Arkla's dire position, the reason why Arkla needed to discharge, the harm suffered by Arkla, and the loss of business income that would result and did result to Arkla if it was not allowed to discharge under the IUP. Despite this, City and Mr. Strong continued to deprive Arkla of its property rights and liberty interests without any hearing and to jointly engage in a pattern of activity which intentionally limited Arkla's ability to discharge and thus its ability to operate its business.

737573.1

39.

As a result of these incidents and pattern of behavior, Arkla requested a meeting with Mr. Strong to discuss the contents of the February CO. This meeting was set and confirmed by Mr. Strong for March 1, 2006.

40.

Upon arrival at the meeting, rather than being granted an opportunity to informally discuss the contents of the February CO, Arkla, without any prior notice whatsoever, was informed by Mr. Strong that the agreed upon informal meeting would, in fact, be a formal "Show Cause" hearing in which evidence against Arkla would be presented, witnesses would be called by the City (who had apparently been given prior notice of the meeting's purpose), and factual findings would be made. This hearing was personally presided over by Mr. Strong, who had directly signed and issued the February CO.

41.

During the hearing, City personnel and staff, under the direct supervision and guidance of Mr. Strong, presented "evidence" or "facts" allegedly supporting the findings in the February CO.

42.

Due to the direct actions of Mr. Strong, including but not limited to the manner in which the meeting was called and the lack of notice as to the meeting's purpose, this hearing did not provide any meaningful opportunity for Arkla to be heard nor did it in any fashion satisfy even the basic tenets of due process.

737573.1

43.

At the end of the hearing, Mr. Strong (who had directly signed the February CO, changed the format of the informal meeting into a formal hearing, personally presided over the hearing, ordered witnesses to appear, guided these witnesses in their testimony, and refused to allow Arkla to contest the facts and testimony propounded by the City) issued an Order On Hearing.

44.

Although the Order On Hearing allowed Arkla to discharge wastewaters, provided that additional conditions and restrictions were met, the City and Mr. Strong continued to withhold approval for Arkla to discharge its wastewaters under either its IUP or the Order On Hearing for several days after the issuance of the Order On Hearing. Again, this refusal was made despite Arkla's complete and total compliance with both its IUP and the conditions presented in the Order On Hearing. This denial also resulted in a deprivation of Arkla's property in the form of lost profits and deprivation of use of its IUP without cause or due process.

45.

The February spill, and the incidents related above, are only the beginning, and are an integral part, of a pattern of action and behavior by Mr. Strong and/or the City in an effort to deprive Arkla and Mr. Tuma of their protected rights.

737573.1

**The New Compliance Orders**

46.

On March 30, 2006, without a warning to Arkla, a request to Arkla for an explanation of the underlying facts, or even a Show Cause Hearing, Mr. Strong signed and issued a second Compliance Order (the March CO). The March CO, among other things, alleged that Arkla had discharged an unauthorized 6.1 million gallons of wastewater to the City's POTW. The only supporting evidence provided was an alleged discrepancy between the flow meter readings and the size of the tanks at Arkla.

47.

In the March CO, Arkla was ordered by Mr. Strong, "pursuant to the authority vested in the Director," to "permanently cease all discharges from its plant." The March CO also revoked Arkla's IUP.

48

Thereafter, without a warning to Arkla, a request to Arkla for an explanation of the underlying facts, or even a Show Cause Hearing, another CO was issued to Arkla on April 5, 2006 (the April CO). The April CO realleged that Arkla was responsible for the spill that occurred on or about February 14, 2006.

49.

The April CO, issued by Mr. Strong, stated that "pursuant to the authority vested in the Director [Mr. Strong]," Arkla was to "permanently cease all discharges from its plant." Despite the language of the March CO, the April CO also revoked Arkla's IUP.

737573.1

In this CO, Mr. Strong also ordered Arkla to pay $239,726.85 as a repayment for the City's alleged response costs related to the February spill.

50.

In both the March and April COs, Mr. Strong personally acted as investigator, prosecutor, and adjudicator. Prior to their issuance or thereafter, no manner of hearing or due process was ever granted to Arkla or Mr. Tuma by Mr. Strong or the City regarding these COs or the deprivations of Arkla's property rights and liberty interests which took place as a result of their issuance.

51.

Additionally, on information and belief, the City and/or Mr. Strong indicated to third parties that Arkla was responsible for the February spill or release and, by making such statements, caused Arkla's customers to cease using Arkla, thus contributing to the loss of business income. These representations were further disclosed to the public in later court filings and COs made by the City and Mr. Strong, all of which are part of the public record.

52.

Mr. Strong also made at least one statement to the print media that as a direct result of his investigation, compliance orders were issued to Arkla. These statements appeared in The Shreveport Times on April 7, 2006.

53.

Mr. Strong has also made at least one statement to the television media that Arkla was responsible for the spill.

54.

These statements indicated Mr. Strong's conclusion about Arkla. The statements harmed Arkla's reputation, its standing in the business community, its ability to do business, and its ability to produce income. Mr. Strong's intentional use of these statements eroded Arkla's customer base and income stream and further resulted in a deprivation of Arkla's protected interests. Yet again, no hearing or any manner of due process was given to Arkla either before or after this deprivation.

## Arkla's Previous Federal Filing

55.

As a result of Mr. Strong's and the City's actions against Arkla, Arkla and Mr. Tuma filed a claim in federal court on April 10, 2006, in an attempt to protect its rights by, among other things, having Mr. Strong removed from the decision-making process regarding Arkla and Mr. Tuma. *Arkla Disposal Services, Inc. and John E. Tuma vs. The City of Shreveport and H.M. "Mike" Strong, as Director of the Department of Operational Services*, CV06-0594 S, Western District, Shreveport Division. The pleadings, memoranda, and court records of that proceeding are incorporated herein by reference.

56.

As a part of this filing, Mr. Strong was shown to have prejudged the adjudicative facts in dispute as well as the punishment he intended to provide to Arkla (i.e., revoking the IUP). Mr. Strong was also shown to be unable to provide a fair and impartial hearing to Arkla.

737573.1

57.

On April 10, 2006, at oral argument, the City agreed to remove Mr. Strong from the adjudicative decision-making process relating to Arkla by creating the Comprehensive Environmental Board of Appeals (CEBA) and referring the March and Aprils COs to it for further proceedings. A Consent Order to that effect was drafted and signed by the Court on April 15, 2006. Arkla and Mr. Tuma, in good faith, dismissed the April 10 federal suit without prejudice.

58.

On information and belief, the federal suit and the result obtained by Arkla and Mr. Tuma established, as these matters relate to Arkla and Mr. Tuma, Mr. Strong's lack of impartiality, his bias against Arkla and Mr. Tuma, his prejudgment of adjudicative facts, his willingness to use official power to 'pull' Arkla's IUP, and his willingness to utilize a blatantly unconstitutional adjudicative governmental process in furtherance of his goal of pulling Arkla's IUP. Additionally, and on information and belief, Arkla's and Mr. Tuma's successful challenge to Mr. Strong's unilateral assertions of power was an "affront" to Mr. Strong and further inflamed Mr. Strong's disposition towards Arkla and Mr. Tuma.

**The May Agreement**

59.

Thereafter, in an attempt to mollify the City and Mr. Strong so that Arkla and Mr. Tuma could protect and preserve the IUP, which Arkla and Mr. Tuma needed to stay in

737573.1

business (a fact which was well known to Mr. Strong and the City), Arkla agreed to pay the City a certain amount of its response costs.

60.

In the Settlement Memorandum, dated May 2, 2006 and May 3, 3006 (the May Agreement), Arkla agreed to pay the City's alleged response costs in the amount of $181,530.04 and in return and as result of that payment, the City agreed to withdraw the March and April COs and thus the revocation of the IUP. Arkla and/or Mr. Tuma paid the promised amount and the City and Mr. Strong withdrew the March and April COs without prejudice.

61.

Subsequent to the May Agreement and with the perceived and implied threat of the re-issuance of the March and April COs hanging over them (i.e., another revocation action), Arkla and/or Mr. Tuma assisted in the clean-up of the February spill. To date, Arkla and/or Mr. Tuma have paid approximately one million dollars to clean-up the remnants of the February spill, which was never shown to have been caused by Arkla or Mr. Tuma in an attempt to obtain a appropriate certificate from the Louisiana Department of Environmental Quality (LDEQ).

## Subsequent Actions

62.

Arkla and Mr. Tuma proceeded in good faith under the May Agreement.

737573.1

63.

Mr. Strong has continued to act under color of his office and state and local law to deprive Arkla and Mr. Tuma of his protected rights.

64.

Mr. Strong and the City issued an updated IUP on or about June 14, 2006, which allowed a discharge of up to 600 gallons per minute (GPM).

65.

Mr. Strong made an oral representation to Mr. Tuma that Mr. Strong and the City would be willing to amend Arkla's IUP if Arkla and Mr. Tuma built larger discharge tanks to accommodate the 600 GPM discharge rate.  Acting in reliance on that verbal promise, Arkla and Mr. Tuma obtained approvals from LDEQ to construct the tanks and spent approximately $1.3 million on these tanks and related matters.  Thereafter, Mr. Strong refused to honor his previous agreement to amend the permit to allow discharges from these new tanks.

66.

Beginning around May or June of 2006, an unprecedented series of inspections and investigative actions were directed at Arkla by Mr. Strong and the City.  These actions included but are not limited to City personnel sampling discharges at Arkla's facility on numerous occasions and observing the timing of discharges.  On August 25, 2006, City personnel entered the Arkla facility in violation of inspection ordinances and facility protocol, and without regard to the safety of Arkla's employees or operations, in a vain attempt to uncover actionable regulatory issues.

737573.1

67.

On September 21, 2006, Mr. Strong and the City again revoked Arkla's IUP based solely on six alleged and unfounded minor 'violations.' Mr. Strong and the City ordered Arkla and Mr. Tuma to attend another "Show Cause" Hearing to affirmatively show why its IUP should not be revoked.

68.

Despite the level of the City's investigatory effort on the part of Mr. Strong and the City, only six minor and alleged "violations" were cited against Arkla and Mr. Tuma in the September 21, 2006 letter. Three of the alleged violations were paperwork in nature, relating to the timing of discharges as opposed to the quality or characteristics of the discharge. One such timing 'violation' related to a four minute discrepancy.

69.

At the 'hearing' held on October 10, 2006, Mr. Strong personally presided over and controlled the hearing, ordered witnesses to appear, guided these witnesses in their testimony, withheld documents from Arkla, presented documents for the first time at the hearing, and refused to allow Arkla to question the witnesses or adequately contest the facts and testimony propounded by the City. The hearing did not provide Arkla or Mr. Tuma any meaningful opportunity to be heard and, again, did not meet even the basic tenets of due process. The transcript of the October 10, 2006, and all attachments and 'exhibits' associated therewith, are incorporated herein by reference.

70.

On November 14, 2006, Mr. Strong issued a Cease and Desist Order, Revocation of Permit and Order to Terminate Discharge, with Findings of Fact and Conclusion in Regard to the Show Cause Hearing Held on October 10, 2006 (the Revocation). Mr. Strong and the City ordered the revocation of Arkla's IUP based on only three of the six alleged violations. These three purported violations upon which the Revocation was based are the three paperwork 'violations' relating to the timing of the discharges. On information and belief, violations of this nature do not normally result in the revocation of an IUP.

71.

All three of the discharges constituting the 'violations' upon which Mr. Strong and the City relied to issue the Revocation were within the permit limits established by the City in the IUP. None involved any violations of permit limitations, quality of discharges, or threats to human health, the environment, or property.

72.

At no time have Mr. Strong or the City even alleged to Arkla or Mr. Tuma that any of the City's infrastructure, equipment, or personnel were ever harmed or affected in any way by discharges from Arkla. At no time have Mr. Strong or the City even alleged to Arkla or Mr. Tuma that its discharges have impacted in any way the POTW or the quality of the discharges from the POTW.

737573.1

73.

On several occasions after issuance of the Revocation, Arkla and Mr. Tuma filed various pleadings requesting reconsideration or dismissal of the Revocation. Mr. Strong and the City denied each and every one of them.

74.

The Revocation (and a subsequent, corrective one issued on December 4, 2006) ordered Arkla to cease discharges within thirty days. Arkla ceased discharging to the City on December 31, 2006.

75.

Throughout this process in the Fall of 2006, and continuing to the date of filing, the previous pattern followed by Mr. Strong and the City did not stop. On an almost daily basis, City personnel parked a fully-marked City van on the road in front of Arkla's facility. City personnel assigned to the van would sample Arkla's discharges and check the flow meters. City personnel continue to parked a fully-marked City van on the road in front of Arkla's facility on a routine basis.

76.

The continued and blatant monitoring performed jointly by Mr. Strong and the City was intended to, and in fact resulted in, interference with Arkla's and Mr. Tuma's ability to conduct both intra- and interstate business activities and caused further deprivation and degradation of Arkla's and Mr. Tuma's reputation, standing in the business community, customer base, and income - all of which are the property of both

737573.1

Arkla and Mr. Tuma. This is evidenced by repeated references to Arkla from its customers about the relentless presence of the City van and personnel in front of Arkla's facility.

77.

In January 2007, a suit was filed against both Arkla and the City as a result of the February spill. In that suit, City filed a cross-claim against Arkla. *Mike Sanders vs. Arkla Disposal, et. al.*, 1st Judicial District Court, Caddo Parish, Louisiana., No. 509,126-A.

78.

Despite filing this cross-claim, City then filed a completely separate suit, utilizing a separate law firm, relating to the February spill. The suit alleges facts from the same transaction and occurrence as asserted in the cross-claim in the above-mentioned suit. *City of Shreveport v. Arkla Disposal Services, Inc., American International Specialty Lines Insurance Company, and CCS Energy Services, L.L.C.*, No. 509,862-A, 1st Judicial District Court, Caddo Parish, Louisiana. This suit, with was authorized by Mr. Strong and the City, seeks monetary damages from the February spill and performance by Arkla of the May Agreement.

79.

The filing of this second, duplicative suit is nothing more than a continuation and integral part of the previous pattern of harassment and intimidation directed at Arkla and Mr. Tuma by the City and Mr. Strong. This second suit is part of the public record and is a further attempt to interfere with Arkla's and Mr. Tuma's ability to conduct intra- and

737573.1

interstate business activities and further erode their reputation, standing in the business community, customer base, and income stream. As such, the second suit should be removed to this Honorable Court for adjudication.

## COUNT ONE: VIOLATIONS OF RICO

80.

The allegations of Paragraphs 1 - 79 are incorporated herein.

81.

Mr. Strong is a person and an employee of the City.

82.

The City is an 'enterprise' as that term is defined in 18 U.S.C.A. § 1961. The City is engaged in or conducts activities which affect, directly or indirectly, interstate commerce.

83.

The City's activities directly or indirectly affect interstate commerce through various regulatory activities (including permitting, collection of fees, regulating discharges, zoning, and taxes), which include but are not limited to the interstate commerce activities of Arkla and Mr. Tuma.

84.

As Arkla's business is transacted in interstate commerce, the City and Mr. Strong's activities related to, and/or interference with, Arkla's business activities have had a direct affect on interstate commerce.

737573.1

85.

Mr. Strong has conducted or participated, directly or indirectly, in the conduct of the City's affairs through a 'pattern of racketeering activities,' as those terms are defined in 18 U.S.C.A. § 1961, which is unlawful pursuant to 18 U.S.C.A. § 1962(c).

86.

Mr. Strong and/or the City have engaged in 'racketeering activity,' as that term is defined in 18 U.S.C.A. § 1961(1). The 'pattern of racketeering activity' is evidenced by the numerous actions taken either directly or indirectly by Mr. Strong and the City towards Arkla and Mr. Tuma, which are described in the preceding incorporated allegations.

87.

Mr. Strong and the City have, through their actions against Arkla and Mr. Tuma described hereinabove, obstructed, delayed, and/or affected interstate commerce and/or the movement of an article or commodity in commerce, and/or have attempted and/or conspired to do so, by 'extortion,' as that term is defined in 18 U.S.C.A. § 1951(b), in violation of 18 U.S.C.A. § 1951(a).

88.

The 'extortion,' as that term is defined in 18 U.S.C.A. § 1951(b), committed by Mr. Strong and the City involved obtaining property from Arkla and/or Mr. Tuma by the wrongful use of inducing a reasonable fear of economic loss or acting under color of official right, through the following list of illustrative activities and/or list of properties or rights:

737573.1

a) The specific incident(s) referenced in Paragraph No. 60;

b) The specific incident(s) referenced in Paragraph No. 61;

c) The specific incident(s) referenced in Paragraph Nos. 78 and 79;

d) Arkla's IUP (which is a vested property right);

e) Revoking the IUP and/or ordering the cessation of discharges no less than five times;

f) Obtaining various monies not due Mr. Strong and/or the City through the threat, stated or implied, of revocation of the IUP, and/or the actual revocation of the IUP, which Mr. Strong and the City knew Arkla needed to remain  in business;

g) Monies paid by Arkla and Mr. Tuma to make changes in equipment at Arkla's facility in the form of "corrective actions," based on alleged 'violations';

h) Monies paid by Arkla and Mr. Tuma to purchase new larger discharge tanks and associated expenses as a result of representations made by Mr. Strong that such expenditures would result in amendments to Arkla's IUP to allow Arkla and Mr. Tuma to conduct discharges from the new tanks necessary to carry out its expanded business activities;

i) Denying use of the larger tanks to discharge to the POTW;

j) Arkla's and Mr. Tuma's customer base, reputation, good will, and standing in the business community;

k) Utilizing City personnel and equipment to create an almost constant and/or regular presence in front of the facility which creates a stigma of wrongdoing

737573.1

and impacted and/or harmed Arkla's and Mr. Tuma's business relationships
with its customers;

l) Removing Arkla's and Mr. Tuma's ability to conduct normal and legal business
activities; and

m) Depriving Arkla and Mr. Tuma of income streams.

89.

Mr. Strong and the City conducted the aforementioned obstruction, delay, and/or
or affect to or with commerce through the following list of illustrative activities:

a) Attempting to restrict or otherwise make Arkla's IUP and discharge tanks
economically useless;

b) Revoking the IUP and/or ordering the cessation of discharges no less than five
times;

c) Refusing several times to reconsider the decision to revoke the IUP;

d) Refusing to meet with Arkla and/or Mr. Tuma to resolve issues that may exist
and/or providing meaningful meetings;

e) Obtaining monies from Arkla through the use of regulatory actions and
lawsuits;

f) Utilizing City personnel to create an almost constant and/or regular presence
in front of the facility which creates a stigma of wrongdoing and impacted
and/or harmed Arkla's and Mr. Tuma's business relationships with its
customers;

g) Denying Arkla the use of its new, larger, and more expensive tanks;

h) Inducing Arkla to expend funds on tanks, equipment, and associated expenses by promising to allow Arkla to amend its IUP (such promises of which were never honored by either Mr. Strong or the City);

i) Wrongfully used Mr. Strong's office and color of official right to instill a reasonable fear in Arkla and Mr. Tuma through threats of "pulling" their IUP and thereby depriving them of their business and chosen vocation; and

j) The specific incident(s) referenced in Paragraph No. 88.

90.

Pursuant to 18 U.S.C.A. § 1961(5), and as described by the preceding incorporated allegations, there were more than two incidents of such activity within a ten (10) year timeframe. See also 18 U.S.C.A. § 1961(1)(B). Each action taken by the City and Mr. Strong described by the above factual allegations pled herein constitutes an individual count of racketeering activity.

91.

All of the above actions were done under color of Mr. Strong's official rights as Director of the Office of Operational Services for the City and resulted in a direct property loss to both Arkla and Mr. Tuma of their tangible and intangible properties.

92.

Arkla and Mr. Tuma have been injured in their business and property by reason of these racketeering violations and are hereby entitled to threefold the damages sustained by them, the costs of this suit, and reasonable attorney's fees pursuant to 18 U.S.C.A. § 1964(c).

737573.1

## COUNT TWO: VIOLATIONS OF ARKLA'S AND MR. TUMA'S CIVIL RIGHTS
## UNDER 42 U.S.C.A. § 1983

93.

The allegations of Paragraphs 1-92 are incorporated herein.

94.

The City and/or Mr. Strong have acted under, used, utilized, or otherwise relied on various provisions of federal law, state law, and local ordinances to deny Arkla the right and/or privilege of discharging into the POTW, revoke the IUP, and demand over $239,000 in "repayment" for cleanup costs relating to the February 2006 spill.

95.

Both the City's and Mr. Strong's actions under color of ordinance, regulation, usage and/or custom towards Arkla and Mr. Tuma have resulted in a deprivation of their legal rights which are secured by the U.S. Constitution and federal laws.  Thus, City and Mr. Strong are liable to Arkla and Mr. Tuma under 42 U.S.C.A. § 1983.

96.

The IUP itself and the right to discharge into the POTW pursuant to the IUP are property rights in which Arkla has vested property interests.  The IUP and the right to discharge, therefore, have value.

97.

Arkla and Mr. Tuma have vested and protected property rights in the IUP, right to discharge,  equipment, income, business relationships, customer base, money, reputation,

737573.1

and standing in the business community.   These property interests were created and protected by the U.S. and Louisiana Constitutions, as well as federal and state law.

98.

Arkla and Mr. Tuma had vested and protected liberty interests to pursue the occupation, vocation, and business of their choosing free from interference, impairment, and unfavorable intent from the City and/or Mr. Strong.   These liberty interests were created and protected by the U.S. and Louisiana Constitutions, as well as federal and state law.

99.

The revocation and/or restriction and/or denial of use of the IUP and discharge tanks eliminates and/or reduces their value.

100.

The revocation of the IUP and the denial of the right to discharge into the POTW will and/or did decrease Arkla's net worth, its continued viability as a business entity, its ability to create income, and the overall value of the Arkla business enterprise.   In turn, the value of Mr. Tuma's interest therein was and/or is likewise reduced.

101.

The revocation and/or restriction and/or denial of use of the IUP and the denial of the right to discharge into the POTW operate as a taking without adequate due process of law.

102.

The restriction, impairment, and/or denial of the vested and protected property rights and liberty interests operate as a taking without adequate due process of law.

103.

Arkla and Mr. Tuma had at all pertinent times the right to procedural and substantive due process relating to any deprivations of liberty and/or property under the U.S. Constitution.

104.

Arkla and Mr. Tuma had at all pertinent times the right to equal protection and enforcement of the laws pursuant to the U.S. Constitution.

105.

Arkla and Mr. Tuma had at all pertinent times the right to be free from malicious prosecution pursuant to the U.S. Constitution.

106.

City and Mr. Strong deprived Arkla and Mr. Tuma of these rights.

107.

On information and belief, these actions were, among other things, in retaliation against Arkla and Mr. Tuma for their exercise of protecting their Constitutional rights through the filing of the aforementioned suit against the City and Mr. Strong in federal court and brought on by Mr. Strong's personal feelings about Arkla and Mr. Tuma.

737573.1

108.

Every action described hereinabove taken by the City and Mr. Strong adversely effected Arkla's and Mr. Tuma's recognized rights and interests in their property and liberty.

**Substantive and Procedural Due Process**

109.

The actions of the City and Mr. Strong, as set forth above, violated Arkla's and Mr. Tuma's rights to substantive and/or procedural due process. These were a series of random, unauthorized deprivations of rights for which there was no pre- or post-deprivation hearings, no right of judicial review, and provided no means for which due process could have been satisfied.

110.

The following list of illustrative actions by Mr. Strong and/or the City violated Arkla's and Mr. Tuma's rights to substantive and/or procedural due process:

a) Failing to hold meaningful hearings;

b) Failure to hold any hearings at all on certain matters;

c) Presiding personally over hearings;

d) Failing to give Arkla and Mr. Tuma fair notice of the purpose and intent of hearings;

e) Calling and directing "witnesses" in their testimony during such hearings;

f) Preventing adequate questioning of witnesses

737573.1

g) Preventing Arkla and Mr. Tuma from having access to "evidence"; and

h) Prejudging adjudicative facts.

**Stigma Due Process**

111.

Mr. Strong also publicly made false assertions and comments to the media and press about Arkla and Mr. Tuma being the sole cause of the February 2006 spill and/or guilty status of Arkla. These statements were further disclosed to the public through documents which are part of the public record in the form of alleged violations citations and court filings.

112.

By having an almost continuous presence of City personnel in front of the Arkla facility, through actions such as parking a clearly marked City van outside of Arkla's facility, Mr. Strong and the City were further making additional public statements about the guilty status of Arkla and/or Mr. Tuma which created an air of impropriety around and about the Arkla facility.

113.

Mr. Strong's public statements to the media and press regarding Arkla's and Mr. Tuma's fault regarding the February 2006 spill and further public statements about the guilty status of Arkla and/or Mr. Tuma are unfounded.

114.

These statements were intended to, and indeed did, take, interfere with, and impede Arkla's and Mr. Tuma's customers, business, income, and liberty to pursue their chosen occupation, profession, and vocation.

115.

These statements infringed Arkla's and Mr. Tuma's liberty and property interests by damaging Arkla's and Mr. Tuma's reputation and standing in the business community. This directly resulted in damages, including without limitation loss of business, loss of income, and an infringement of Arkla's and Mr. Tuma's protected liberty interests to participate in the profession and vocation of their choosing.

116.

These statements subjected Arkla and Mr. Tuma to public infamy and scorn which resulted in the aforementioned infringements of Arkla's and Mr. Tuma's protected property and liberty interests.

117.

These statements and the City's other actions have created an air of impropriety that have induced others to name Arkla as the sole cause of the February spill in recently filed litigation which has caused Arkla to incur other damages, attorney's fees, and costs.

**Equal Protection**

118.

Mr. Strong's and the City's pattern of discrimination against Arkla and Mr. Tuma was designed to single them out for unfair treatment and selective enforcement based on

their presence in a "class of one." This class of one was created by Mr. Strong's personal feelings towards Mr. Tuma and Arkla, as well as by Arkla's and Mr. Tuma's filing of the previously-mentioned lawsuit against the City and Mr. Strong in federal court.

119.

Arkla and Mr. Tuma also belong to a class of businesses (those businesses which deal in hazardous materials) which are often the subject of strict public scrutiny, alarm, and distrust.

120.

Arkla is also similarly situated to other members of a discernable and definable class and/or subclass of persons, to wit: 1) Industrial Users of the POTW; and Industrial Users of the POTW who handle oil; and 3) Industrial Users of the POTW who handle oil and whose IUP contains an oil and grease discharge parameter.

121.

Arkla and Mr. Tuma were treated differently from all other businesses in the area by Mr. Strong because of their presence in one and/or all of these classes.

122.

After the February 2006 spill, Mr. Strong never adequately investigated any other businesses who used the Lift Station or the City's own negligent failures, and instead, focused immediately and without cause or reason on Arkla. Thus he treated Arkla and Mr. Tuma differently from every other business who used the same pipeline and discharged the same types of material. No other similar businesses who used the pipeline leading to the POTW have been accused by either Mr. Strong or the City.

737573.1

123.

No other businesses under Mr. Strong's purview who participate in Arkla's general field of business have been subjected to the types of invasive, particular scrutiny, and level of regulatory oversight (such as parking a City van outside a facility on an almost daily basis) by the City or Mr. Strong,  Therefore, similarly situated individuals were treated differently.

124.

While Arkla was prohibited from and/or severely restricted in making discharges to the POTW under its IUP, all other similarly-situated businesses were allowed to freely make all needed discharges.

125.

This selective enforcement/selective prosecution was motivated by improper considerations, i.e. Arkla's and Mr. Tuma's participation in a field of business subject to great public scrutiny and suspicion, as well as their standing in a class of one.  This selective enforcement was also deliberately based on an arbitrary classification and Arkla's and Mr. Tuma's classification as a class of one.

126.

Mr. Strong's actions were also motivated by Mr. Strong's feelings towards Arkla and Mr. Tuma as a result of their previous federal suit.  Mr. Strong and the City were also motivated by a desire to prevent Arkla's and Mr. Tuma's exercising of their Constitutional rights, i.e. their liberty to pursue a chosen occupation, vocation, or profession and their protected property interests as described hereinabove.

737573.1

127.

By harming Arkla's and Mr. Tuma's reputation and through disparate treatment based on improper motives, City and Mr. Strong sought to deprive, and indeed did deprive, Arkla and Mr. Tuma of property and liberty interests, namely their customer base, income stream, IUP, ability to use the equipment located at Arkla's facility, and liberty to participate in the vocation and business of their choosing.

128.

There was no rational basis for the disparate treatment of Arkla and Mr. Tuma. The discrimination was irrational, wholly arbitrary, and based on illegitimate animus and subjective ill-will. As a result, the actions of the City and Mr. Strong were arbitrary and capricious, and both Arkla and Mr. Tuma were singled out for selective enforcement. This exercise of power and choice of sanctions were, moreover, a blatant abuse of power.

129.

Thus, Mr. Strong and the City singled out a person belonging to an identifiable group (both a "class of one" and a business dealing with hazardous materials), initiated various enforcement actions with discriminatory intent, and these same actions had a discriminatory effect on Arkla and Mr. Tuma. These actions by the City and Mr. Strong were, therefore, a violation of Arkla's and Mr. Tuma's rights to equal protection under the law.

130.

Through the constant abuses of power and violations of Constitutional rights as described above, Arkla and Mr. Tuma were also subjected to malicious prosecution by

737573.1

the City and Mr. Strong in violation of their Constitutional right to be free from malicious prosecution.

### 131.

By using and/or abusing his power and color of his office to deprive Arkla and Mr. Tuma of their Constitutionally protected rights, Mr. Strong has made himself individually liable for all of the damages claimed by Arkla and Mr. Tuma, including liability for punitive and treble damages. He has used the color of state and local law to deprive Arkla and Mr. Tuma of their Constitutional rights and is therefore personally liable for the deprivation of those rights.

### 132.

The actions and patterns of actions described above evidence a custom or policy, thereby subjecting both the City (a local governmental entity and employer of Mr. Strong) to liability under § 1983 as well as Mr. Strong in his official capacity (as a local official).

## DAMAGES

### 133.

Arkla and/or Mr. Tuma have suffered damages as a result of the actions or inactions of the City of Shreveport and/or Mike Strong:

a)      monetary losses in the form of lost business income;

b)      monetary losses in the form of penalties and fines;

c)  monetary losses in the form of expenditures made by Arkla as a result of City actions and/or under the "promise" of being able to use its IUP, tanks, and equipment;

d)  monetary losses spent in cleaning up or otherwise related to the February spill;

e)  loss of investment in the new, larger tanks;

f)  monetary losses in defending and/or replying to the recently filed litigation;

g)  costs of this litigation and the April, 2006 federal suit; and

g)  other actual monetary losses and/or expenses to be proven at a trial of the merits.

### RELIEF REQUESTED

**Wherefore**, Complainant respectfully requests this Court grant the following

relief:

a)  Complainant requests it be awarded damages as set forth above in an amount to be set by this Court against the City of Shreveport and H. M. 'Mike' Strong (in both his individual and official capacity), as well as all attorneys and expert fees, all costs of these proceedings, and treble and/or punitive damages.

b)  Complainant also requests all other just and equitable relief as this Honorable Court may deem proper.

737573.1

All of which is most respectfully submitted.

BREAZEALE, SACHSE & WILSON, L.L.P.
One American Place, 23rd Floor
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197
Telephone: 225-387-4000
Fax: 225-381-8029

John B. King, La. Bar Roll No. 17004
Micah A. Gautreaux, Bar Roll No. 30516

737573.1

 **BREAZEALE, SACHSE & WILSON, L.L.P.** ATTORNEYS AT LAW

JOHN B. KING
*Partner*
*jbk@bswllp.com*

DIRECT DIAL: 225-381-8014
CORPORATE PHONE: 225-387-4000
FAX: 225-381-8029
One American Place, 23rd Floor
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197

www.bswllp.com

February 26, 2007

**Via Hand Delivery**

Honorable Robert H. Shemwell
Clerk of Court
U.S. District Court - Western District of
Louisiana - Shreveport Division
1167 U.S. Courthouse
300 Fannin Street
Shreveport, LA  71101-3083

      RE:    Arkla Disposal Services, Inc. and John E. Tuma v. The City of Shreveport
             and H.M. "Mike" Strong, in his official capacity as Director of the
             Department of Operational Services and in his personal capacity

Dear Mr. Shemwell:

       Enclosed please find an original and three (3) copies of a Civil Cover Sheet, Complaint, Verification of Complaint, and Corporate Disclosure Statement in the above-captioned matter. Please conform and certify two copies for service on defendants as indicated in the Complaint, conform and certify one copy for our records, and return all three copies to our courier.

       I have enclosed our check in the amount of $425.00 to cover the costs incurred in filing the Complaint and any fees for certification of the copies.

       If you have any questions or concerns, please do not hesitate to contact me.

       Thank you for your assistance in this matter.

                    Sincerely,

                    **BREAZEALE, SACHSE & WILSON, L.L.P.**

                    John B. King

JBK/sbr
Enclosures

*signature*

# UNITED STATE DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| ARKLA DISPOSAL SERVICES, INC.<br>and JOHN E. TUMA | )<br>)<br>) |
| versus | )<br>) |
| THE CITY OF SHREVEPORT AND<br>H. M. "MIKE" STRONG, in his official<br>capacity as Director of the Department of<br>Operational Services and in his personal<br>capacity | )<br>)<br>)<br>)<br>) |

5:07-CV-0350          S'PORT
JUDGE HICKS
MAGISTRATE JUDGE HORNSBY

MAGISTRATE:

## VERIFICATION OF COMPLAINT

BEFORE ME, the undersigned Notary Pubic, came and appeared

### John E. Tuma

who after being duly sworn, deposes and states:

1.      I am fully competent to make this affidavit and I have personal knowledge of the facts stated in this affidavit.

2.      I am the President of Arkla Disposal Services, Inc.

3.      I have read the Complaint and hereby aver that the facts stated therein are true and correct to the best of my knowledge, information, and belief.

4.      Mr. Strong has directly stated to me that, if Mr. Strong had to take action against Arkla again, Mr. Strong would 'pull your permit.' Additionally, Mr. Strong has made at least one statement to the print media that based on his investigation of the February spill, "we have now issued a compliance order" to Arkla. The Shreveport Times, April 7, 2006. Further, Mr. Strong has also made at least one statement to the television media that Arkla is responsible for the February spill.

Date: February __25__, 2007

By: _____
        John E. Tuma

THUS SWORN AND SUBSCRIBED BEFORE ME, the undersigned Notary Public, this __25th__ day of February, 2007. _Tammy M. Burdin #060283_
                                                                                        Notary Public

TAMMY M. BURDINE, NOTARY PUBLIC
  BOSSIER PARISH, LOUISIANA
  MY COMMISSION IS FOR LIFE

40

737573.1

*not original signature*

RECEIVED

FEB 26 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

## UNITED STATE DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

ARKLA DISPOSAL SERVICES, INC.    )
and JOHN E. TUMA                 )
                                 )
versus                           )
                                 )
THE CITY OF SHREVEPORT AND       )
H. M. "MIKE" STRONG, in his official )
capacity as Director of the Department of )
Operational Services and in his personal )
capacity                         )

**5:07-CV-0350          S'PORT**
**JUDGE HICKS**
**MAGISTRATE JUDGE HORNSBY**

MAGISTRATE:

### CORPORATE DISCLOSURE STATEMENT

Arkla Disposal Services, Inc., herein represented by John E. Tuma, hereby

declares that CCS Energy Services, LLC owns more than 10% of its stock.

Date: February 25, 2007

By: _____
     John E. Tuma

41

737573.1

## UNITED STATE DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

ARKLA DISPOSAL SERVICES, INC.        )
and JOHN E. TUMA                     )      **5:07-CV-0350        S'PORT**
                                     )      **JUDGE HICKS**
versus                               )      **MAGISTRATE JUDGE HORNSBY**
                                     )
THE CITY OF SHREVEPORT AND           )
H. M. "MIKE" STRONG, in his official )      MAGISTRATE:
capacity as Director of the Department of )
Operational Services and in his personal )
capacity

### CORPORATE DISCLOSURE STATEMENT

Arkla Disposal Services, Inc., herein represented by John E. Tuma, hereby

declares that CCS Energy Services, LLC owns more than 10% of its stock.

Date: February 2 5 , 2007

By: _____
      John E. Tuma

41                                                    737573.1

PLEASE SERVE ALL OF THE PRECEDING ON THE FOLLOWING:

The City of Shreveport
through the Honorable Mayor Cedric B. Glover
505 Travis Street
Shreveport, LA 71101

H.M. "Mike" Strong
505 Travis Street, Suite 580
Shreveport, LA 71101

737573.1

RECEIVED
IN LAFAYETTE, LA.

FEB 2 6 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATE DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

ARKLA DISPOSAL SERVICES, INC.        )
and JOHN E. TUMA                                    )
                                                              )        **5:07-CV-0350          S'PORT**
                                                              )        **JUDGE HICKS**
versus                                                    )        **MAGISTRATE JUDGE HORNSBY**
                                                              )
THE CITY OF SHREVEPORT AND            )
H. M. "MIKE" STRONG, in his official      )
capacity as Director of the Department of  )        MAGISTRATE:
Operational Services and in his personal   )
capacity                                                  )

## NOTIFICATION OF OTHER ACTIONS

NOW INTO COURT, through undersigned counsel, comes Arkla Disposal Services, Inc. and John E. Tuma (collectively "Plaintiffs"), who respectfully aver as follows:

In compliance with Local Civil Rule 3.1 of the Western Federal District of Louisiana, Plaintiffs hereby notify this Honorable Court of the following currently pending actions which may comprise all or a material part of the subject matter and/or operative facts of this action.

These cases arise out of a release of material from a pipeline located in the City of Shreveport, Caddo Parish, State of Louisiana. Based on the pleadings of the cases listed hereinbelow, it has been alleged that Franks Investment Company, L.L.C. is the owner and lessor of the property on which the pipeline was located; that Mike Sanders is the lessee of the property on which the pipeline was located; that the City of Shreveport is the operator of the pipeline; and that the Caddo-Bossier Port Commission d/b/a Port of Shreveport-Bossier is the owner of the pipeline. All of these parties, including Plaintiffs, have been either named or implicated in at least one (if not all) of these cases. All four of these proceedings are currently pending in the same court and involve some common, if not identical, issues of fact, law, and requested relief.

737932.1

1.  *Mike Sanders v. Arkla Disposal Services, Inc., Arkla Disposal, LLC, and the City of Shreveport*, No. 509,126-A, 1st Judicial District Court, Caddo Parish, Louisiana.  Petition for Damages of Mike Sanders claiming various damages as a result of the February 14, 2006, spill.

2.  *City of Shreveport v. Arkla Disposal Services, Inc., American International Specialty Lines Insurance Company, and CCS Energy Services, L.L.C.*, No. 509,862-A, 1st Judicial District Court, Caddo Parish, Louisiana.  Petition for Damages by City of Shreveport claiming various damages as a result of the February 14, 2006, spill.

3.  *Franks Investment Company, L.L.C. v. Arkla Disposal, L.L.C., et. al.*, No. 509,860-B, 1st Judicial District Court, Caddo Parish, Louisiana.  Petition for Damages by Franks Investment Company, L.L.C. claiming various damages as a result of the February 14, 2006, spill.

4.  *Caddo-Bossier Parishes Port Commission v. Arkla Disposal Services, Inc., American International Specialty Lines Insurance Company, Arkla Disposal, L.L.C., and CCS Energy Services, L.L.C.*, No. 509,871-A, 1st Judicial District Court, Caddo Parish, Louisiana.  Petition for Damages filed by the Caddo-Bossier Port Commission d/b/a Port of Shreveport-Bossier claiming damages as a result of the February 14, 2006, spill.

737932.1

All of which is most respectfully submitted.

BREAZEALE, SACHSE & WILSON, L.L.P.
One American Place, 23rd Floor
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197
Telephone: 225-387-4000
Fax: 225-381-8029

_____
John B. King, La. Bar Roll No. 17004
Micah A. Gautreaux, Bar Roll No. 30516

3

737932.1